UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLEE JACKSON,

        Petitioner,               Civil No. 06-15158
                                                  Honorable David M. Lawson

v.

HUGH WOLFENBARGER,

        Respondent.
_____/

## **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

The petitioner, Clee Jackson, presently confined at the Gus Harrison Correctional Facility in Adrian, Michigan, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* petition, Clee challenges his convictions from two separate jury trials held in the Wayne County, Michigan circuit court. In the first case, the petitioner was convicted of being a felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. In the second case, the petitioner was convicted of two counts of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1)(a), and two counts of second-degree criminal sexual conduct. Mich. Comp. Laws § 750.520c(1)(a). The petitioner was sentenced to concurrent prison terms of ten-and-a-half to twenty years on his first-degree criminal sexual conduct counts, five to fifteen years on his second-degree criminal sexual conduct counts, and two to five years on his felon-in-possession count, and a consecutive two-year term on his felony-firearms count. The petitioner argues that his convictions were obtained by a coerced confession and in violation of his privilege against self-incrimination; his trial and appellate counsel were constitutionally ineffective; the convictions are not supported by sufficient evidence; and his convictions are based on altered court documents. The respondent has filed a response to the

petition arguing that some of the claims are procedurally defaulted and the others lack merit. The Court finds that the claims lack merit and will deny the petition.

I.

The Michigan Court of Appeals provided summarized the facts of the cases as follows:

Defendant's convictions in LC No. 01-008235-01 arise from allegations that, on May 17, 2001, defendant, who was a convicted felon, negligently caused the death of his wife's eight-year-old son by leaving a loaded gun in a place accessible to the child.

Madinah Grimmett testified that, at the time of the incident, she and her son had been residing in defendant's home for several months. Grimmett indicated that, on the day of the incident, she, defendant's wife, and four children were in the living room. Grimmett and defendant's wife told three of the children, including the victim, to leave the room, and the victim and defendant's nine-month-old daughter went into a room across the hall, which was set up as a bedroom with furniture and a television. Thereafter, Grimmett heard a noise, went into the room, and saw the victim, who had been shot, lying on the floor.

According to Grimmett, a friend of the Jackson's [sic] named Ty had also been living in defendant's house, and staying in the room where the incident occurred. She indicated that, approximately two or three weeks before the incident, she observed Ty with the gun. Grimmett acknowledged that she did not mention Ty in either a May 17, 2001, statement she gave to the police or in her preliminary examination testimony. She also acknowledged that, at the preliminary examination, she indicted [sic] that she was aware that a gun was kept in the closet.

At the time of the incident, defendant was not home. A Detroit police officer testified that he spoke with defendant shortly after the incident. According to the police report, defendant stated that "he got the gun from Ty for protection from his ex-girlfriend's brothers." He also stated that the gun was originally kept in the closet of the room where the incident occurred, but "[h]e had caught his three year old trying to get it so he put it in between the mattresses to keep it away from the three year old."

A Detroit police evidence technician testified that, upon searching the room, he found two mattresses, and a loaded .357 magnum on the floor. He also discovered a .56 magnum shotgun in the closet of the room. . . .
. . .
Defendant's convictions in LC No. 01-008240 arise from allegations that, on May 7 and 8, 2001, while his twelve-year-old daughter was visiting him, defendant touched her breasts and buttocks, put his mouth on her vagina, and inserted his penis

into her vagina. The twelve-year-old victim testified that, in May 2001, she and her eleven-year-old brother came from Georgia to Detroit to visit defendant, who is her father. On the first day of her visit, defendant told her to go take a bath and prepare for bed. . . . After bringing [her some] clothes, defendant left, but returned and said that he had to use the bathroom. . . . According to the victim, after defendant returned, he pulled back the shower curtain, told her to stand on the front part of the tub, touched her on one of her breasts and her buttocks, and licked her vagina. The victim testified that defendant also asked her if she liked what he was doing, but she did not respond. . . .

The victim testified that, after the bathroom incident, she put on her clothes and went into the living room . . . to sleep. . . . Shortly thereafter, defendant awakened her and pulled down the right leg of her underwear and sweatpants. The victim testified that defendant then "us[ed] his tongue on [her] vagina," "used his penis in [her] vagina, and "used his tongue again and he stopped." The victim testified that her brothers were in bed and defendant's wife was upstairs asleep with a baby, and that she cried during the incident, but did not tell defendant to stop. She further testified that defendant left and returned later to perform cunnilingus on her again.

According to the victim, on the following night, when Angela Johnson, a friend of the victim's mother, came to defendant's house, she told Johnson what had occurred. She testified that, after telling Johnson, she told defendant's wife, who told her to sleep upstairs and made her tell her mother what had occurred. . . . Johnson testified that she is a friend of the victim's mother and the mother of one of defendant's sons. She testified that she went to defendant's house, and the victim told her that she had something to tell her. . . . Johnson testified that she took the victim to her mother, and that the victim and her mother had a conversation. The victim's mother, LaToya Avery, testified that, after the victim told her what defendant had done to her, she called the police. . . .

After initially being contacted by the police, defendant gave a statement wherein he denied engaging in any type of sexual activity with the victim. . . . A Detroit police officer testified that defendant subsequently waived his *Miranda*[] rights and gave two written statements, which were admitted into evidence and read into the record. In the first statement, defendant indicated that, while the victim was in the bathroom taking a shower, he entered to give her some clothes and to urinate. According to defendant, when the victim heard him, she pushed the shower curtain aside and grabbed his penis. Defendant indicated that he said, "What you trying to do get us both killed." Defendant claimed that the victim then stood on top of the tub and he "kissed her womb." Defendant stated that, after the victim got down and bent over, he "was about to have sex with her, but "something snapped and [he] remembered that she was [his] daughter and [he] stopped." Defendant denied that he ever "entered her." According to defendant, during the following days, he criticized the victim for "being mannish," and the victim threatened to report him. Defendant

-3-

claimed that the victim was angry and "decided to tell her side before [he] said anything. But [it] wasn't because [he] was scared and embarrassed."

In his second statement, defendant indicated that, when the victim came to visit him, he had not previously seen her in years, but "had heard rumors" about her. He indicated that the victim's mother asked him if the victim and his son could stay with him for a while and he agreed. Defendant maintained that the victim's mother told him that the victim had falsely accused someone of raping her in Georgia. Defendant stated that, on the first night that the victim was visiting, she took a shower. According to defendant, he knocked on the bathroom door to give the victim some clothes, and the victim said that he could come inside because the curtain was closed. He went inside, put down the clothes, and began to urinate in the toilet. According to defendant, the victim pulled back the curtain and touched his penis. He stated that he admonished her . . . Defendant claimed that the victim responded that she did not care what people thought. Defendant stated that the victim then stood on the base of the tub and he "kissed her womb." He stated that she then "got down [and] bent over." Defendant said that he "went to her to have sex," that his "penis did touch her vagina, but [he] never went in her." Defendant stated that he stopped because he "realized it was wrong."

Defendant testified on his own behalf at trial. He denied that he ever touched the victim in a sexual manner, and maintained that the victim's allegations were an act of retaliation by the victim's mother for not marrying her. Defendant indicated that the victim's mother told him that they had to leave Georgia because the victim had falsely accused someone of rape, and that the accused was "after her." Defendant also testified that, several days after the alleged incident, the victim visited him, sat on his leg, apologized for accusing him of rape, and indicated that she "tried to take it back, but her mother wouldn't let her." Defendant admitted that he gave two written inculpatory pretrial statements to the police, but maintained that the police threatened him with life imprisonment if he did not admit guilt. He also claimed that he made a total of four statements, but the police destroyed the first two.

Defendant's fifteen-year-old daughter testified that the victim wrote her a letter, which she lost, indicating that the victim's mother forced her to make false allegations against defendant. The victim denied ever writing a letter to defendant's daughter. . . .

The defense also presented the physician who examined the victim following the alleged sexual assault. He testified that the victim's physical condition was normal, that her hymen was not intact, and that there were no tears in the vaginal area. The doctor testified that, based on the victim's physical examination alone, there was no evidence of sexual assault. He explained that, although the victim's hymen was not intact, he could not conclusively determine that the condition was the result of an

assault. The physician testified, however, that the victim's mental condition was consistent with someone who had been sexually assaulted. . . .

*People v. Jackson*, No. 241597, slip op. at 1-4 (Mich. Ct. App. Dec. 23, 2003).

The juries convicted the petitioner of the crimes listed above. He was acquitted of an additional count of involuntary manslaughter and one count of first-degree criminal sexual conduct. The petitioner's direct appeals were consolidated in the court of appeals. He raised six assignments of error:

> I. His prior consistent statements were improperly admitted.
>
> II. The trial court improperly excluded testimony regarding victim's reputation for telling the truth.
>
> III. Evidence of the victim's prior allegation of sexual assault against a different individual was improperly excluded.
>
> IV. Trial counsel was ineffective by failing to object to victim's mother's hearsay testimony, to present witnesses, and to investigate.
>
> V. The firearms convictions resulted in a double jeopardy violation.
>
> VI. The prosecutor failed to prove the *corpus delecti* of homicide.

The Michigan Court of Appeals affirmed the petitioner's convictions. *People v. Jackson*, No. 241597, 2003 WL 23018259 (Mich. Ct. App. Dec. 23, 2003). The Michigan Supreme Court denied leave to appeal. *People v. Jackson*, 471 Mich. 865, 683 N.W.2d 673 (Mich. 2004).

Thereafter, the petitioner filed a motion for relief from judgment in the trial court, raising the following claims:

> I. Trial counsel was ineffective by failing to appear at or reschedule the hearing on a motion to suppress the petitioner's statements, and failing to prepare for a mid-trial hearing regarding admissibility of the petitioner's custodial statements.
>
> II. The petitioner suffered actual prejudice as a result of counsel's errors.

The trial court denied the motion. *People v. Jackson*, No. 01-8240-01 (Wayne County Cir. Ct. Mar. 4, 2005). The state court of appeals and Michigan Supreme Court denied leave to appeal because the petitioner failed "to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." *People v. Jackson*, No. 264521 (Mich. Ct. App. Mar. 23, 2006); *People v. Jackson*, No. 130877 (Mich. Mar. 31, 2006).

The petitioner timely filed his habeas corpus petition raising the following grounds:

I. Conviction obtained by use of coerced confession.

II. Conviction obtained in violation of the petitioner's privilege against self-incrimination.

III. Ineffective assistance of counsel.

IV. Insufficient evidence to support the "use" prong of felony firearm.

V. A misapplication of clearly established law as to the element of possession for each of the firearm statutes.

VI. The use of altered court documents (preliminary exam.) in a trial to obtain an illegal conviction.

Habeas Pet. at 3-8.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court

-7-

has "explained that an unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, ---,130 S. Ct. 1855, 1862, 1864-65 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached") (internal quotation marks and citations omitted); *see also Knowles v. Mirzayance*, --- U.S. ---, ---, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).

In this case, the state appellate courts in this case issued one-sentence form orders denying the petitioner's appeals of his post-judgment ineffective assistance of counsel claims; consequently, this Court has no reasoned decision or explanation from the state courts for rejecting the petitioner's claims. Where a state court declines to address the merits of an issue, this Court conducts an independent review. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The deferential standard of review prescribed by the AEDPA does not apply because "[t]his statute by its own terms is applicable only to habeas claims that were adjudicated on the merits in State court. . . . Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition . . . questions of law and mixed questions of law and fact [are reviewed] *de novo*." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (quotations and citations omitted). This Court's review of the ineffective assistance of counsel issue raised by the petitioner is "not circumscribed by a state court conclusion" because none of the state courts issued a reasoned opinion on these issues. *Wiggins*, 539 U.S. at 534; *see also Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005).

A.

The petitioner's first and second claims relate to his pretrial statements that were received in evidence against him. The state courts did not rule on these claims because the petitioner never raised them in the state appellate courts. The admissibility of the petitioner's statements was raised during trial, and the trial court found that the statements were voluntary. The petitioner's fourth and fifth claims deal with the sufficiency of the evidence adduced at trial on his weapons offenses, and his sixth claim relates to an allegation that the preliminary examination record was altered with respect to Madinah Grimmett's testimony. As with the claims relating to the statements, these other grounds were never raised in the state court either.

A state prisoner filing a petition for writ of habeas corpus under 28 U.S.C. § 2254 must first exhaust all state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). The prisoner must fairly present the substance of each federal constitutional claim in state court. *See* 28 U.S.C. §§ 2254(b)(1)(A) and 2254(c). "A petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Carter v. Bell*, 218 F.3d 581, 607 (6th Cir. 2000) (quoting *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995)).

The burden is on the petitioner to prove exhaustion. *Rust*, 17 F.3d at 160. He cannot do so here with respect to claims one, two, four, five, and six. Although he raised the issue of admissibility of his confession in his post-conviction motion when he challenged his trial counsel's handling of a suppression hearing, he never argued that in fact his statements were inadmissible or improperly obtained. The petitioner no longer has an effective state remedy to exhaust his new claim because the Michigan Court Rules prohibit filing second or successive motions for relief from judgment, *see* Mich. Ct. R. 6.502(G)(1). The petitioner has already filed one post-conviction petition and cannot satisfy either of the two exceptions to the prohibition on filing the second petition: a retroactive change in the law or newly discovered evidence. Mich. Ct. R. 6.502(G)(2); *see Mohn v. Bock*, 208 F. Supp. 2d 796, 800-01 (E.D. Mich.2002).

"The disappearance of state procedural remedies which evaporate with time will not completely excuse a prisoner's failure to avail himself of them, however. The Court may review

a prisoner's procedurally defaulted claims on the merits only if he shows cause for not raising his claims at all levels of state court review and prejudice, or that he is actually innocent of the crimes for which he was convicted." *Mohn,* 208 F. Supp. 2d at 801 (citing *Gray v. Netherland*, 518 U.S. 152, 162 (1996), and *Hannah v. Conley*, 49 F.3d 1193, 1195-96, 1196 n.3 (6th Cir. 1995) (citing *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991), and *Murray v. Carrier*, 477 U.S. 478, 496 (1986))). The petitioner alleges ineffective assistance of counsel as cause to excuse his default. However, ineffective assistance of appellate counsel on direct review would not excuse the petitioner's failure to present these claims in his state court post-conviction motion. *See Hannah*, 49 F.3d at 1197. These claims are procedurally defaulted and barred from review unless the petitioner can establish that a constitutional error resulted in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

The fundamental miscarriage of justice exception applies only in cases where the habeas petitioner demonstrates that the alleged constitutional error resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. "[T]he petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. In other words, the petitioner must show "that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). Here, the

petitioner does not meet the new evidence standard set forth in *Schlup*, and in fact, presents no new evidence at all that would indicate his innocence.

Because claims one, two, four, five, and six are not properly before the Court, the petition will be denied as to those grounds

B.

The claim that remains is the allegation that trial and appellate counsel were constitutionally ineffective in several respects. The respondent contends that this claim is barred by the rule of procedural default as well. "Procedural default is not a jurisdictional bar to review [of] the merits" of an issue, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The Court deems it more efficient in this case to proceed directly to the merits of the petitioner's claim, since ineffective counsel is alleged as the "cause" for the failure to raise the issues on direct appeal and preserve them for habeas review.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if the attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. However, "[j]udicial scrutiny of

counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 689 (internal quotes omitted)). Counsel's conduct is entitled to the strong presumption that it falls within the wide range of reasonable professional assistance, and the petitioner must overcome the presumption that the conduct "might be considered sound trial strategy." *Strickland*, 466 U.S. at 688 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Higgins v. Renico*, 470 F.3d 624, 632 (6th Cir. 2006) (observing that "[s]uch [strategic] choices can vary greatly from attorney to attorney and from case to case, and reviewing courts must scrutinize these choices with a great deal of deference").

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. A court making this determination must consider the totality of the evidence before the factfinder. *Id.* at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

The Supreme Court has held that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). The Court explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy. . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754. Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

The petitioner contends that his first appointed trial attorney was ineffective by failing to appear in court on three separate occasions. The record does not clearly reflect that counsel failed to appear. In addition, to the extent that counsel failed to appear, the petitioner does not allege that court proceedings took place in absence of counsel.

The petitioner also claims that his second appointed attorney, Ronnie Cromer, Jr., was ineffective in failing to appear for a hearing on a motion to suppress the petitioner's statements and failing to prepare for a mid-trial suppression hearing. The state court record confirms that Cromer indeed failed to appear for a pretrial motion hearing. The state court record also shows that at the next scheduled court date Cromer explained to the Court that he had misunderstood the court's instruction as to when the hearing would occur and mistakenly understood that it would occur on the date set for trial to commence. This scheduling misunderstanding is insufficient to render counsel ineffective.

Although trial counsel failed to appear for the scheduled suppression hearing, he did challenge the admissibility of the petitioner's custodial statements during a mid-trial hearing outside

the jury's presence. Following that hearing, the trial court determined that the petitioner was advised of and understood his rights before he gave his statements. The petitioner argues that the statements were involuntary nevertheless because he suffered from mental illness, was distressed about the death of his son, and was scared for his life. The petitioner testified at trial in his own defense that he made these inculpatory statements because police threatened him and told him that being forthcoming was his only hope of receiving anything less than a life sentence. He said he was given a break during the interrogation and had an opportunity to talk with his wife, who advised him not to give a statement to police.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *See Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). The ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Factors to consider include the presence or absence of police coercion (a "crucial element"), length of interrogation, location of interrogation, continuity of interrogation, the suspect's maturity and education, the suspect's physical condition and mental health, and whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). Without coercive police activity, however, a confession will not be deemed involuntary. *Connelly*, 479 U.S. at 167 (stating

that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").

Here, one of the reasons that the petitioner gave inculpatory statements was the hope to secure more favorable sentence inspired by his interrogators' statements. But speculation that cooperation will have a positive effect does not render a confession involuntary. *United States v. Wiley*, 132 F. App'x 635, 639-40 (6th Cir. 2005); *cf. Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir.1991) (acknowledging that some degree of "carrot-and-stick approach to eliciting information from an uncooperative suspect" is acceptable), *rev'd on other grounds*, 507 U.S. 680 (1993). The petitioner has not alleged any specific facts that would support an argument that his mental illness rendered the waiver of his *Miranda* rights unknowing. His own trial testimony reflects that he assessed the potential benefits of making a statement to police and, after such consideration, decided to make a statement. His testimony provides no support for an argument that he suffered from a mental illness that prevented him from understanding his rights and waiving them at the time.

The record demonstrates that trial counsel's misunderstanding of the court's schedule for the suppression hearing had no effect on the presentation of the merits of the issues to the trial court. The state court determined the issues from the evidence presented. The petitioner's trial testimony fortified the conclusion that the statements were voluntary and not coerced. The petitioner, therefore, cannot demonstrate either deficient performance or prejudice by his trial counsel. *Strickland*, 466 U.S. at 687-88.

Nor did appellate counsel's decision not to raise these claims on direct review did fall outside the wide range of reasonably competent professional assistance. The petitioner submitted a letter from appellate counsel stating that appellate counsel considered and rejected these claims because

-16-

she considered them meritless. Perhaps prudence dictates over-inclusiveness when sorting through the possible claims to be raised on direct appeal to avoid the risk of omitting a potentially meritorious claim. However, as noted earlier, those strategic choices are left to counsel. *Perry*, 908 F.2d at 59. In this case, the Court finds that counsel's decision was the result of sound professional judgment.

The petitioner has not shown that either his trial or appellate counsel were constitutionally ineffective. Therefore, he is not entitled to habeas relief on this claim.

III.

For the reasons stated, the Court concludes that the petitioner is not in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: September 30, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 30, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO